**Lourie Hollyfield TARVER et al., Appellants,**

**v.**

**G. V. YOUNGBLOOD et al., Appellees.**

No. 5009.

Court of Civil Appeals of Texas.

Beaumont.

Dec. 31, 1954.

Rehearing Denied Jan. 19, 1955.

Buchanan & Stover, Silsbee, for appellants.

James F. Parker, Beaumont, B. F. Whitworth, Houston, for appellees.

R. L. Murray, Chief Justice.

This is an appeal by Lourie Hollyfield Tarver and Grady Tarver, and Terrell Buchanan, appellants, from a judgment in the district court of Hardin County decreeing their undivided interest in a 160 acre tract of land in the James Rafferty League.

Plaintiffs, Security Realty & Development Company, a firm owned by Violet G. O'Fiel, joined by her husband, David E. O'Fiel, sued to establish their undivided interest in and to a 160 acre tract in the James Rafferty League in Hardin County, Texas, and in other lands as well. By stipulation, this controversy was limited to the 160 acre tract in controversy. Named as defendants were various other persons claiming an interest in said land, including the Houston Oil Company of Texas and American Republics Corporation. It was stipulated that the latter two companies hold valid and subsisting oil, gas and mineral leases on said 160 acre tract as against all other parties plaintiff and defendant. The latter two companies filed their answer and a cross-action in the nature of a bill of interpleader or stakeholder action against plaintiffs and all the other defendants, and alleged that said companies had obtained production from said 160 acre tract as lessees, and were unable to make payment of the royalty therefrom because of conflicting claims to the royalty, and praying that the royalty ownership of the various parties hereto be adjudicated. All defendants answered setting up their alleged claims.

The defendants, Lourie Hollyfield Tarver and husband, Grady Tarver, and Terrell Buchanan answered to the trial court

setting up claim to an undivided 1/80th interest in the 160 acres by virtue of a conveyance from L. L. Williams and James F. Parker, and setting up claim to an additional interest in said land, alleging that Lourie Hollyfield Tarver was the sole heir at law of Claude Hollyfield, deceased, and that the latter was an adopted son of Hannon Hollyfield, deceased, by common law adoption, and that they were entitled to a 26.5/864th interest in said property thereby, in addition to the 1/80th interest. It was stipulated that the 160 acres in controversy was the community property of Hannon Hollyfield and wife, Mary, and that Hannon Hollyfield died intestate. The other defendants in this suit are the natural children of Hannon Hollyfield, and their heirs and assigns. Trial was to the court without a jury, and judgment was rendered adjudging and finding that Hannon Hollyfield did not adopt Claude Hollyfield, deceased, and awarding appellants only their undivided 1/80th interest in said property, subject to the oil and gas leases aforesaid.

The appellants' first three points, under which they present their contentions in regard to the adoption, are that the trial court erred in its finding of fact and conclusion of law and judgment that Claude Hollyfield was not adopted as a son by Hannon Hollyfield in any manner for the reasons (1) there was no evidence to support them; (2) the evidence was insufficient to support them; and (3) such finding, conclusion and judgment were contrary to the overwhelming preponderance of the evidence, and were so contrary to the overwhelming weight of all the evidence as to be clearly unfair and unjust.

The principal issue involved in this appeal is the correctness of the trial court's finding and holding that Claude Hollyfield was not the adopted son of Hannon Hollyfield, and in allowing appellants a recovery of their 1/80th interest, only. To determine this issue we must examine all of the evidence and must consider it in the light of the rule announced in Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972, 977. Our question here is identical with the question in that case and it is stated for our guidance by Judge Calvert in the opinion in that case as follows, "The question here is not whether the trial judge could have found the existence of the agreement as alleged from the evidence here summarized but whether he was compelled to do so; not whether the relevant facts and circumstances as established by the acts and conduct of the parties would authorize a logical inference that the agreement did exist but whether such facts and circumstances would permit of no other reasonable inference."

By a stipulation of the parties it was established that the 160 acres in controversy was the community property of Hannon Hollyfield and his wife, Mary; Hannon Hollyfield died intestate July 21, 1931 and was survived by his wife, Mary Hollyfield, and the several children fully identified in the stipulation. Prior to his marriage to his wife Mary he was married to Lou Hooks and to this marriage two children were born who are identified as parties to the suit. Lou Hooks died prior to the acquisition of the land in controversy by Hannon Hollyfield and died intestate. There is a reference in such stipulation to "the estate of Claude Hollyfield, deceased," but there is no statement therein as to the date of the death of Claude Hollyfield, or what the relation is between him and the appellants.

W. C. Britton testified that he had lived in Silsbee since 1918, that he worked in a bank at Silsbee, knew Hannon Hollyfield during his lifetime and knew Claude Hollyfield; that when Hannon and Claude were present Claude addressed Hannon as his father and Hannon addressed Claude as his son, and that so far as he knew they were known generally in the community as father and son. He dealt with them primarily as father and son on loans at the bank, they were required to sign notes together, when Claude needed money he would ask him to get his father to sign the note with him and sometimes the two would come in together and make cattle loans. It was his understanding that they owned cattle together.

John T. Wright testified that he lived in Hardin County since he was about 14 years old and he was born in 1877; he knew Hannon Hollyfield during his lifetime; he did not know who Hannon Hollyfield married the first time; he told him he married in Mississippi the first time and come here, then he married Nannie Haynes, then he married Lou Hooks in 1900; he and Hannon Hollyfield married sisters, the witness having married Linie Jane Hooks. He further testified:

"Q. Before Hannon Holyfield married Lou Hooks, did he live with anyone else? A. Him and his wife—

"Q. I mean did he live with anybody besides his wife? A. Ada McIntosh.

"Q. Did Ada have any children? . A. Yes, she had a boy; she called him Claude.

"Q. Hannon didn't marry her? A. Not so far as I know.

"Q. What was her position there? A. He was a big farmer; he had his mother and father, and Ada McIntosh kept house for him.

"Q. This boy, Claude, was born on his place? A. Yes, on his place, right in his house.

"Q. Was Hannon living with this Ada McIntosh? A. I guess he was, he claimed to be.

"Q. Were you staying with Hannon? A. I worked for him that year; that is the year he made that big cotton crop, in 1900.

"Q. I thought you said in 1900 that you lived in Tyler County. A. Well, I lived right across the line, I worked for Hannon that year, though.

"Q. After this child was born, what happened to him? A. They stayed there until he was a pretty big kid and Hannon wanted to get rid of Charley Moss and he told Ada he would take the boy and raise him as his adopted

boy, and that she could come and see him when she wanted to. He said he would raise him as his adopted boy.

"Q. Did you hear that? A. Yes.

"Q. You heard Hannon tell Ada McIntosh that he would take him as his adopted child? A. Yes, I did.

"Q. You understand that Clara Haynes and Lillie Gore are children of Hannon Holyfield and Lou Hooks Holyfield? A. Yes.

"Q. They are your nieces? A. Yes.

"Q. Do you know they are still claiming an interest in the Holyfield estate? A. Yes.

"Q. Did Ada McIntosh marry Charley Moss? A. Yes, they married on Sunday, and they went up to Holyfield's and stayed all night.

"Q. Did the child stay with Hannon Holyfield? A. He stayed there with Hannon Holyfield's mother.

"Q. Hannon Holyfield wasn't married? A. No, he wasn't married then. After Charley and Ada married, he stayed at his mother's and father's. Him and the kid both, up until him and Lou married.

"Q. Did Hannon and Lou take Claude with them when they married? A. He carried him with him and kept him until Lou died. Then after Lou died, Hannon and Mary married, and they kept Claude.

"Q. What name did Claude go by? A. Claude Holyfield.

"Q. What relationship did Hannon hold him out to be? A. He called him his own kid.

"Q. He called him his own child? A. His own child.

"Q. What did Claude call Hannon? A. He called him 'Daddy'.

"Q. Did Hannon provide for him as he would a child? A. He taken care

of him just like he did the rest. I couldn't tell no difference.

"Q. Was he fond of him? A. Yes, he was crazy about him.

"Q. How about Claude, did he help his father around the home there? A. Yes, he did everything he was called on to do. He helped him all time. After Claude married, he still helped him with his cattle.

"Q. Did he help him farm? A. Yes, they all farmed together there."

On cross-examination he testified that "Ada McIntosh is alive and lives over here the other side of Evadale; they say she is helpless and couldn't get around;" he has not seen her in a long time but he was told that she is still living.

On further cross-examination he testified:

"Q. You say Claude was living with Hannon, he was born at Hannon's house? A. Yes, sir.

"Q. Where were Hannon's mother and father living? A. About a mile the other side of him.

"Q. Did Hannon ever live with them? A. Yes, when he didn't have a wife.

"Q. How many housekeepers did Hannon have employed? A. Them three is all I know, Ada and—

"Q. Claude lived with Uncle Bill and Aunt Sarah? A. He stayed with them until Hannon married again, then he stayed back and forth.

"Q. You say Hannon lived with Uncle Bill and Aunt Sarah? A. He did when he didn't have a wife.

"Q. Where did he live then? A. In the river bottom, then he had a place out there in the pine woods.

"Q. Was Claude born at Hannon's house or Uncle Bill and Aunt Sarah's house? A. He was born at Hannon's they told me.

"Q. How long did he stay with Uncle Bill and Aunt Sarah? A. He stayed with them until Hannon and Lou married, then he moved back up there with them.

"Q. You don't know how much he stayed with Uncle Bill and Aunt Sarah? A. He stayed with them until Lou and Hannon married.

"Q. Do you know anything about any property that Hannon give Claude later on during his life? A. No.

"Q. Do you know whether or not he give him anything? A. No.

"Q. Do you know whether or not he give him any cattle, sheep, land or anything like that in settlement for labor? A. I don't know about that. He owned some cattle.

"Q. You said Claude called Hannon 'Daddy'? A. Sometimes he called him daddy and sometimes he called him Uncle Hannon.

"Q. Didn't he, for the truth, call him Uncle Hannon all the time? A. Not all the time, sometimes he called him daddy and sometimes he called him Uncle Hannon."

Further on cross-examination:

"Q. You were pretty close to Hannon Holyfield back there when Ada McIntosh had this child? A. Yes.

"Q. You were close to him all the time? A. Yes.

"Q. Before Hannon died, isn't it a fact that he gave Claude a deed to a tract of land? A. I don't know. I didn't see that; what he give him, I don't know.

"Q. You heard this conversation between Hannon and Ada? A. Yes.

"Q. Didn't Hannon tell you that he gave Claude a tract of land and some cattle because he wouldn't inherit from him? A. No, he didn't tell me that.

"Q. What did you mean by the word 'adopted'? A. He told Ada he would take the kid and have him adopted, and she could come to see him as often as she wanted to.

"Q. Did he say the word 'adopted'. A. He said adopted.

"Q. Isn't it a fact that he told her he would raise the boy? A. Yes, he said he would take the boy and raise him as his own kid, adopt the kid; that is what he told me."

On re-direct examination he testified:

"Q. Mr. Wright, you have heretofore testified that you were present at the time and heard Hannon Holyfield tell Ada McIntosh that he would agree to take Claude and raise him as his own. What did Ada say? A. She told him she would agree to that if he would do that.

"Q. Did she ever thereafter take Claude back? A. No, sir."

Fayette Hooks testified that he lived near Silsbee in Hardin County and had lived in Hardin County 80 years; Lou Hooks Holyfield was his half-sister; she married Hannon Holyfield; he knew Claude Holyfield and Claude was Hannon's boy. On direct examination he testified:

"Q. At the time Hannon married your sister, Lou, where was Claude living? A. My sister and Hannon Holyfield took Claude and raised him.

"Q. Did Claude live in the home with Hannon and Lou Holyfield? A. He certainly did.

"Q. Were you there on one occasion? A. Hundreds of times, I guess.

"Q. How long were Hannon and Lou married before Lou died. A. A good long time.

"Q. About how many years? A. I don't know.

"Q. Did Claude live with them as long as they lived together as husband and wife? A. Yes.

"Q. Did Hannon tell you Claude was his adopted son? A. We all know that Claude was Hannon's boy.

"Q. What did Hannon tell you about him? A. He told me he was going to take him, give him an education and give him one-half of his stuff.

"Q. Where did he say he got the boy? A. I know where he got the boy.

"Q. What did Hannon say about it? A. I done told you that; I told you that a year ago.

"Q. Well, Mr. Hooks, its what you tell us now. A. Hannon told me it was his boy, he had adopted him and he was going to raise him and give him half his stuff.

"Q. Where did he get the boy? A. He was Ada McIntosh's boy.

"Q. Where was Claude born? A. In Hannon's house up there.

"Q. Lillie and Clara are your nieces? A. Yes.

"Q. Have you seen them around here? A. I ain't looked for them.

"Q. Have you seen them? A. I haven't seen them, and besides if I looked for them, I couldn't see them, cause I can't see.

"Q. One time you said he was going to adopt him, and another time you said he had adopted him. A. That's what he told me.

"Q. What did he tell you? A. He told me he had adopted that boy and was going to raise him and educate him and give him half his stuff.

"Q. How long did Claude continue to live in Hannon's home? A. A long time, until he got married.

"Q. What did Claude call Hannon? A. He called him daddy.

"Q. What did Hannon call Claude? A. Son.

"Q. Did Hannon provide for Claude when he was a child? A. He sure did.

"Q. Did Claude help his daddy as a boy? A. Sure.

"Q. Did he help him after he got grown? A. Sure he did.

"Q. Did he help him after he got married? A. Yes, some with his cattle and hogs.

"Q. Were they known in the community as father and son? A. Yes, sir, they sure was."

E. Moss testified, called as a witness by appellees, that he was born the next year after the Civil War ended and was about 20 years old when he came to Texas and has lived in Hardin County ever since; he lived in the neighborhood about four miles from where Hannon Hollyfield lived; that he had known Claude Hollyfield since he was born; he was born at Uncle Bill Holyfield's place, he disremembered who was Claude's mother, Charlie Moss married her; her name was Ada McIntosh he thought; before Ada and Charlie Moss married she took the baby and sat him down on the floor and said, "Sarah, you can have that child"; he supposed that she gave him to them because Charlie wouldn't take him; Claude lived with Uncle Bill and Aunt Sarah about 20 years, he thought; he didn't think Claude ever lived with Hannon; Claude was given to Uncle Bill Holyfield and Aunt Sarah by Ada; before Claude married Hannon let him have in settlement somehow or other, he helped Hannon tend to the cows when he bought them, marked them and branded them, before he died he let him have some cows, he thought he let him have 10 head of cows, some sheep, goats and chickens; that was before Claude married; Claude called Hannon Uncle Hannon and he never in his life heard him call him anything else; if Hannon ever agreed to adopt Claude it is something the witness never did know. On cross-examination he testified that Aunt Sarah had told him about Ada McIntosh giving Claude to Aunt Sarah. The trial court sustained an objection to what he had heard Aunt Sarah say. E. Moss was recalled as a witness and testified as follows:

"Q. Mr. Moss, you testified awhile ago that Ada Moss, she is Ada Moss right now, is that right? A. Yes.

"Q. What relation is she to you? Is she your sister-in-law? A. Charlie Moss and me are first cousins.

"Q. Is Charlie Moss here today? A. He was here a while ago, I seen him.

"Q. Is his wife here? A. She was here, I think they went home.

"Q. Ada, the mother of Claude, was here in the Court today, you saw her? A. Yes, she was in the car; she can't walk.

"Q. Did you see her around the Court? A. No, she can't walk, she was in the car.

"Q. Is she crippled up? A. Yes, has rheumatism, or something, she has to be toted.

"Q. You testified this morning that you were not present at the time you said Ada gave Claude to Sarah. When did Sarah tell you that Ada brought the child over there and set the child in the floor and give it to her? A. She didn't bring it over there; the child was there.

"Q. You say Ada give the child to Aunt Sarah Holyfield, Hannon's mother? A. That's what Aunt Sarah told me.

"Mr. Buchanan: I object to that. It is based on hearsay. Ada didn't tell him that, Sarah told him that.

"The Court: Objection sustained.

"Q. Did Ada ever tell you that? A. Ada told me a long time after that that she gave him to Aunt Sarah.

"Q. Did Ada ever tell you that she gave Claude to Uncle Bill and Aunt Sarah?

"Mr. Buchanan: I object to the leading questions, putting words into the witness' mouth.

"The Court: Objection sustained.

"A. I told you a while ago she never give him at all to Uncle Bill, she give him to Aunt Sarah.

"Q. How many told you, then, that Ada gave Claude to Aunt Sarah, how many people told you that? A. I heard that.

"Q. Who told you? A. She told me.

"Q. You said 'she' told you; who is 'she'? A. Aunt Sarah told me, and way after a while, after Charlie and Ada married, they moved to Evadale and we was talking about the boy and she said, 'Uncle Elias, I give my baby to Aunt Sarah'.

"Q. Who were you talking to at that time? A. Ada.

"Q. So it was way later on that Ada told you she gave Claude to Aunt Sarah? A. Yes, after they moved to Evadale. Uncle Bill had Claude in there and Claude stayed right on in there until Claude got big enough to help tend to the cows and he helped tend to them."

While the evidence shows that Claude Hollyfield was born about 1900 and Hannon Hollyfield died in 1931 there is no evidence that Claude during his lifetime made any claim to any interest in the property of Hannon Hollyfield, deceased, or that he ever claimed the benefits of any contract on the part of Hannon to adopt him. Ada McIntosh, Claude's mother, was still living in the county where the case was tried but did not testify either in person or by deposition on the trial.

■■ We do not believe that it can be said from the above evidence that there is no evidence to support the fact finding by the trial court that there was no adoption of Claude by Hannon Hollyfield. We are also convinced that such evidence is sufficient to sustain the finding by the trial court and that such finding by the trial court is not against the overwhelming weight and preponderance of the evidence. It would not have been unnatural nor abnormal, when viewed in the light of common knowledge and experience, for this man to take this child, who witnesses say was his illegitimate son, and rear him to maturity, first at the home of his parents and later in his own home, receiving in return that which was justly due in the way of affection and normal services, without any agreement or intention on the part of Hannon Hollyfield to adopt the child and make him a legal heir to his property. Someone had to care for Claude when he was a baby since his mother married and for reasons sufficient to her and her new husband she apparently did not wish to raise the boy herself. The question of the contract to adopt is raised here when the lips of the alleged adopter and those of the alleged adopted child have been sealed by death and is raised here in an effort to establish an interest in valuable oil producing property. The mother of Claude did not testify to the making of a contract to adopt him. Such claims are and should be received with the utmost caution. Before one who has grown to manhood, married, fathered children and himself died should be decreed to be the adopted child of another, who is also long dead, in the absence of any compliance or attempted compliance with the statute prescribing a simple method of effecting the status, proof of the facts essential to invoking the intervention of equity should be clear, unequivocal and convincing. Cavanaugh v. Davis, supra. With such a rule in mind, we are firmly convinced that the trial court was not compelled under this evidence as a matter of law to find that Hannon Hollyfield had in fact adopted Claude.

■ We think that the evidence of the witness Moss that both Ada McIntosh and Sarah Hollyfield had told him at different times that Ada gave Claude as a child to Sarah, Hannon's mother, was admissible in evidence and could be properly considered by the court. Such testimony is in the same class with the testimony of the witnesses

who testified in behalf of the appellants that Hannon had told them that he had adopted the boy, or was going to adopt him and raise him as his own child. See Cubley v. Barbee, 123 Tex. 411, 73 S.W.2d 72.

It is well settled that a Court of Civil Appeals cannot substitute its findings of fact for those of the triers of the facts in the trial court if there is any probative evidence to sustain the trial court's findings. Cavanaugh v. Davis, supra, and cases cited therein. Appellants' first three points of error are overruled.

The fourth point of the appellants complain of the finding by the trial court that there was no evidence that the appellants are the heirs of Claude Hollyfield and have not shown themselves to be entitled to inherit from him. We have examined the statement of facts and stipulations and find no evidence that appellants are heirs of Claude Hollyfield, but we think it unnecessary to discuss this point in view of our holding above that the trial court's finding of fact holding that there was no adoption was sustained by the evidence.

Finding no error, the judgment of the trial court is affirmed.