**Curley Joseph GUIDRY et al., Appellants,**

v.

**Betty Joyce DENKINS, Appellee.**

**No. 15690.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Nov. 27, 1970.

Wandel & Bousquet, Thomas G. Bousquet, R. D. McPherson, Houston, for appellants.

William R. Thielen, Harold R. Allison, Houston, for appellee.

PEDEN, Justice.

Suit to determine heirship of L. D. Guidry, who died intestate on May 31, 1965. The appellants are a brother of L. D. Guidry and the wife of a brother who died after L. D. did. The appellee is the illegitimate daughter of L. D. Guidry. The separate suits filed by the opposing parties were consolidated in the Probate Court, and after trial there and appeal to the District Court, the appellants now appeal from a judgment of that court, after a non-jury trial de novo, that the appellee Mrs. Betty Joyce Denkins is the sole heir of L. D. Guidry by virtue of adoption by estoppel.

The District Judge filed these findings of fact:

I.

"That L. D. Guidry agreed with Betty Guidry Denkins and the natural mother

of the child, Vernaciel Coleman, that he would adopt Betty Guidry Denkins.

## II.

"That the acts, conduction and admissions of L. D. Guidry and Betty Guidry Denkins proved that an agreement to adopt Betty Guidry Denkins by L. D. Guidry existed, and that L. D. Guidry performed his paternal duties under this agreement.

## III.

"That the acts and conduct of L. D. Guidry and Betty Guidry Denkins was strong supporting proof of the existence of this agreement.

## IV.

"That Betty Guidry Denkins relied upon the adoptive agreement and performed duties of child towards adoptive parent."

He also filed this conclusion of law:

"That Betty Guidry Denkins was and is the adopted child of L. D. Guidry, Deceased, that said adoption was by estoppel, and that Betty Guidry Denkins is the sole heir to his estate.

"Signed and entered this 9th day of June, 1970."

In response to a request of the appellants for additional findings of fact and conclusions of law, the District Judge filed the following:

"Findings of Fact:

"1. That there was no formal adoption before a district court of Betty Denkins by L. D. Guidry.

"2. That there was no written agreement by L. D. Guidry that he would adopt Betty Denkins.

"3. That on December 9, 1944 Clarence Gilbert filed an affidavit to correct the name of Betty Joyce Coleman to Betty Joyce Gilbert.

"4. That at no time did L. D. Guidry ever marry Vernaciel Coleman, the mother of Betty Joyce Denkins.

"5. That at the time of the death of L. D. Guidry, L. D. Guidry was divorced from his prior wife and was single.

"6. That at no time during a marriage of L. D. Guidry was any child born to L. D. Guidry, nor formally adopted through district court proceedings by L. D. Guidry.

"7. That at the time of his death, the natural parents of L. D. Guidry were deceased.

"8. That at the time of his death, L. D. Guidry was survived by the following natural brothers and sisters, to-wit:

Curley Joseph Guidry, a full brother

Malcolm Guidry, a full brother

Perfect Guidry, a full brother

Naomi G. Molette, a full sister

Bernice G. Comeaux, a full sister

"9. That at the time of his death, L. D. Guidry was survived by the following children of his natural brother, Jesse Guidry, who had predeceased him, to-wit:

Raymond Guidry, a nephew

Jesse Guidry, Jr., a nephew

Geraldine Guidry, a niece

"10. That two brothers of L. D. Guidry died prior to his death without leaving surviving issue, to-wit:

William Guidry

H. B. Guidry

"11. That L. D. Guidry died on May 31, 1965 as a resident of Houston, Harris County, Texas, when he was fifty-two (52) years of age.

"Conclusions of Law.

"1. That if the adoption of Betty Denkins by L. D. Guidry was not sufficient at law to make her an heir of L. D. Guidry at the time of his death, that the Estate of L. D. Guidry would have been inherited by the following persons in the following percentages:

A. Curley Joseph Guidry, 1/6th interest

B. Malcolm Guidry, 1/6th interest

C. Perfect Guidry, 1/6th interest

D. Naomi G. Molette, ⅙th interest

E. Bernice G. Comeaux, 1/6th interest

F. Raymond Guidry, 1/18th interest

G. Jesse Guidry, Jr., 1/18th interest

H. Geraldine Guidry, 1/18th interest

"SIGNED and ENTERED this the 15 day of June, 1970."

Among their other points of error the appellants contend that the district court erred in finding that L. D. Guidry agreed with Betty Joyce Denkins or Vernaciel Coleman that he would adopt Betty Joyce because there was 1) no evidence, or 2) insufficient evidence of such agreement or 3) the finding of such agreement is against the great weight of the evidence. The appellants filed similar no evidence, insufficient evidence and great weight of the evidence points of error complaining about each of the district court's other three original findings of fact.

The parties stipulated that L. D. Guidry died on May 31, 1965 at the age of 52; he was a resident of Harris County, had married twice, but both marriages ended in divorce prior to his death and no children were ever born to him as legitimate offspring during the course of either marriage. Another stipulation concerned the identity of L. D. Guidry's surviving brothers and sisters and the children of a brother who had predeceased him.

The only three witnesses who testified were appellant Curley Joseph Guidry, appellee Betty Joyce Denkins and her mother, Vernaciel Coleman Gilbert.

Curley Joseph Guidry testified that he had had a stroke about a year before the trial at which he was testifying and it had affected his memory. That L. D. Guidry was his brother, that Curley had lived in Houston for about 52 years and that he first remembered hearing of Betty Denkins when she started to college. His brother, L. D. Guidry, did not bring her to Curley's home when she was a child, but she did visit his home with L. D. after she started to college. L. D. claimed her as his daughter, and on several occasions he heard Betty call L. D. her father.

Curley explained that he had left Beaumont long before L. D. did and later Betty came to Houston and lived with L. D. when she went to college at T. S. U. That he is an ordained minister and performed the ceremony at his home when Betty married Paul F. Denkins in November of 1955 but that her father, L. D., did not attend the wedding.

He stated that he did not know anything about Betty until she came to Houston to go to college. L. D. moved to Houston from Beaumont in 1932 and lived here until his death except for three years in the army. Curley testified that he never did hear any conversation about L. D. adopting Betty, but L. D. did recognize that she was his illegitimate daughter and he also had an illegitimate son and about three other illegtimate daughters, none of whom he ever adopted.

Betty Joyce Denkins, the appellee, testified that her mother, Vernaciel Coleman, was unmarried at the time the appellee was born on October 28, 1934. A corrected birth certificate dated January 12, 1945 was introduced showing the appellee's last name to be Gilbert, and she explained that her mother had later married a man by that name and the birth certificate had been

changed so that the allotment would be increased when Gilbert went into the army.

She couldn't think of any instrument executed by L. D. Guidry that would have changed her name to Guidry or any type of contract agreeing to adopt her. He never told her that he was going to have her adopted by anyone or that he was going to contract with her in writing to adopt her. She related that before she went to T. S. U. she visited L. D. practically every summer since she was about eight years old (she later corrected this to say "since she was about ten"). She would stay two weeks to a month. She came to Houston to attend T. S. U. in about 1951 and lived with L. D. until about 1955, when she got married. L. D. did not leave a will.

The appellee testified that L. D. lived in Beaumont and would come and stay with her mother regularly until he went into the army in about 1942. Her mother married Mr. Gilbert, and when L. D. got out of the army in about '44, he moved to Houston. When L. D. lived in Beaumont and he took her to visit his sisters there, she would call him her father and he would refer to her as his daughter.

The appellee further testified that she was known in school as Betty Guidry and she used that name throughout her lifetime before her marriage. That her father registered her at school under that name. When she visited L. D. in Houston she stayed with L. D.'s two brothers who are now dead, and she knew them as her uncles. She called L. D. her father on those visits and he called her his daughter.

When she went to T. S. U. her father, L. D. Guidry, paid for her education, and she performed chores around the house, such as preparing food for him, washing dishes, making beds and keeping house for him. They referred to each other as father and daughter and treated each other as such.

Some six insurance policies were introduced in evidence each reflecting that L. D. Guidry was the insured and that his daughter, Betty Joyce Guidry, was the beneficiary.

On cross-examination the appellee testified that she did chores for her father and herself while she lived at his house and attended T. S. U. and that she paid him no rent.

On re-direct, she testified that L. D. Guidry talked to her on many occasions about his relationship with her and told her he was going to take care of her and that he did so.

The appellee called as a witness Mrs. Vernaciel Gilbert, the mother of the appellee, who testified that she was not married when the appellee was born in Beaumont on October 28, 1934, and that L. D. Guidry was the father of Betty. We consider noteworthy this testimony of Mrs. Gilbert on direct examination:

"Q Now, after the birth of Betty Denkins, did you see L. D. Guidry?

"A Oh, yeah. He come around every day. Every day.

"Q Did he ever say anything or did you ever have any discussions with L. D. Guidry about Betty Joyce Coleman, her name at that time?

"A No, we didn't.

"Q Or at the time or after her birth, did you ever discuss with L. D. Guidry Betty Joyce, your daughter?

"A Oh, yeah. During the time when he carried her to school. He carried her to school and registered her in his name.

"Q Well, did you ever, though, talk to L. D. Guidry at your home or at your mother's home?

"A Well, I lived with my mother at my mother's home.

"Q Did he visit in your mother's home?

"A    Oh, yeah.   That is where I was living with her.

"Q    Did he ever acknowledge to you that Betty was his daughter?

"A    Oh, yes.

"Q    Did he ever acknowledge to you, that, in front of anyone else?

"A    My mother.

"Q    That fact?

"A    My mother.

"Q    Well, now, did you have any discussions with·him about your daughter?

"A    Yeah.  He told me and also told my mother, he say, 'Verna and I never did marry,' he said, 'But one thing about it, Betty won't have to want for nothing, and I am going to see that she goes through school.'

"Q    Well, did you have any agreements with him?

"A    Yes.

"Q    What was the agreement?

"A    That he will take care of her and support her.

"Q    Did he ever agree that he would take her as his child?

"A    Yes, sir, he sure did.

"Q    Did he ever—

        MR. BOSQUET: I object.  He is leading the witness for one thing.  That calls for a conclusion, a legal conclusion, and I think it is an improper question, and I ask—

        THE COURT: I will sustain as to the leading portion.  I think you are leading the witness.

"Q    (By Mr. Thielen)   Well, I will ask you again, did you ever have any agreement with Mr. L. D. Guidry?

"A    Yes, I did.

"Q    And tell the Court what that agreement was.

"A    That he would support and take care of Betty as long as he lived and Betty lived, that she would always be taken care of."

Mrs. Gilbert corroborated the appellee's testimony that Betty called L. D.'s brothers and sisters as her aunts and uncles and they called her their niece, and that L. D. registered Betty in school as Guidry.  She stated that after L. D. moved to Houston he would come to Beaumont for a visit and he told the witness that after Betty finished school he wanted her to come and live with him and he was going to put her through college, which he did.  She said she visited Betty in L. D.'s home in Houston and he called Betty his daughter. Betty visited her mother in Beaumont on week-ends while attending T. S. U.

The appellee, when called as a witness in her own behalf, testified:

"Q    Mrs. Denkins, you have heard the testimony of your mother regarding conversations that she had with L. D. Guidry regarding you?

"A    Yes, sir.

"Q    Did you have any discussions with L. D. Guidry regarding your position or relationship to him?

"A    Yes, sir.

"Q    Did he ever make any statements or agreements to you?

"A    Yes, sir.

"Q    And what—tell the Court what those statements or agreements were that he made.

"A    Well, he told me that he would take care of me, and if I was good and finished high school he would send me to college.  And he promised, you know, anything I needed, to ask

him for it and he would do it for me, providing I would be good."

Her additional testimony consisted of a statement that L. D. did attend her wedding and that she met Curley Guidry on several occasions in Beaumont when she was a child.

■ Texas appellate courts hold, under facts similar to those in the instant case, that the basis for holding that an adoption by estoppel exists is that adoptive parents and their privies should not be permitted to assert the invalidity of the status of the adopted child when the adoptive parents have received all the benefits and privileges accruing from performance on the part of the child when such performance has been made after an "agreement" or "contract" or promise to adopt. Jones v. Guy, 135 Tex. 398, 143 S.W.2d 906 (1940). An agreement to adopt is an essential element of adoption by estoppel. Grant v. Marshall, 154 Tex. 531, 280 S.W. 2d 559 (1955).

"In no case has this Court upheld the adoptive status of a child in the absence of proof of an agreement or contract to adopt. * * *

"It was not necessary, however, that there be direct evidence of the agreement. It like any other ultimate fact could be proved by the acts, conduct and admissions of the parties and other relevant facts and circumstances." Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972 (1951).

We conclude that the quoted testimony of both the appellee and her mother negatives the purported agreement of L. D. Guidry to adopt the appellee. Both of them were asked what the decedent had agreed to do, and they recited the terms of his promises, none of which included adoption of Betty Joyce. It is uncontroverted that L. D. Guidry carried out the promises he made. It has not been shown that Betty Joyce's mother ever surrendered custody of her to L. D.

L. D.'s lips are sealed by death, but both of those to whom it would be expected that the promise to adopt would have been made, the appellee and her mother, did testify.

It was stated in Tarver v. Youngblood, 274 S.W.2d 442 (Tex.Civ.App.1954, writ ref. n. r. e.) :

"We do not believe that it can be said from the above evidence that there is no evidence to support the fact finding by the trial court that there was no adoption of Claude by Hannon Hollyfield. We are also convinced that such evidence is sufficient to sustain the finding by the trial court and that such finding by the trial court is not against the overwhelming weight and preponderance of the evidence. It would not have been unnatural nor abnormal, when viewed in the light of common knowledge and experience, for this man to take this child, who witnesses say was his illegitimate son, and rear him to maturity, first at the home of his parents and later in his own home, receiving in return that which was justly due in the way of affection and normal services, without any agreement or intention on the part of Hannon Hollyfield to adopt the child and make him a legal heir to his property. * * * The mother of Claude did not testify to the making of a contract to adopt him. Such claims are and should be received with the utmost caution. Before one who has grown to manhood, married, fathered children and himself died should be decreed to be the adopted child of another, who is also long dead, in the absence of any compliance or attempted compliance with the statute prescribing a simple method of effecting the status, proof of the facts essential to invoking the intervention of equity should be clear, unequivocal and convincing. Cavanaugh v. Davis, supra."

See also Garcia v. Saenz, 242 S.W.2d 230 (Tex.Civ.App.1951, no writ).

Our conclusion that as a matter of law the evidence negatives the purported adoption by estoppel amounts to a holding that there is no evidence to support the judgment of the trial court.

It is well established that an illegitimate child does not inherit from its father by descent and distribution. Probate Code, Sec. 42, V.A.T.S.

We do not reach the appellants' other points of error.

The judgment of the District Court is reversed and remanded with instructions to enter a judgment declaring the Estate of L. D. Guidry to have been inherited as determined and stated in that court's conclusion of law filed on June 15, 1970.